THE STATE V. ROSCOE F. WARREN, Appellant.—297 S. W. 397.

Division Two, July 13, 1927.

1. **EVIDENCE: Insanity: Basic Facts.** Testimony of lay witnesses as to their opinions of the real or actual state of mind of defendant is not competent. Only their opinion based on the appearance and conduct of defendant is properly admissible.

2. ———: **Exclusion: Later Admitted.** The improper exclusion of evidence is not error if the excluded testimony is later admitted on the further examination of the same witnesses.

3. ———: **Insanity: Latitudinous Proof: Basic Fact: Opinion of Lay Witnesses.** Defendant's plea of insanity to a charge of murder entitles him to a wide latitude in bringing to the attention of the jury his most trivial

acts and conduct, together with things said by him, which have any legitimate tendency to throw light upon his ability to distinguish between right and wrong conduct in firing the fatal shot; but where lay witnesses are permitted to go into details of his acts and conduct which appeared to them to be out of the ordinary, and to testify to his apparent state of mind, based upon their observations of his appearance, acts and conduct, and to express their opinions concerning his sanity or insanity, he cannot complain that such witnesses are not permitted to state their impressions and opinions as to the basic facts concerning his acts, conduct and mental and physical condition.

4. **EVIDENCE: Insanity: Conclusion.** Testimony by a witness that the conduct of the defendant and others became "very antagonistic" and that defendant became "worried" and "excited" is properly excluded as a conclusion; but testimony of what were the conduct and acts of the defendants and such others, and what they said to each other, is competent on the issue of insanity.

5. ———: ———: **Communicated Threats.** Threats of defendant's associates in business to charge defendant with conduct unbecoming a Mason, to charge him with the crime of embezzlement, and to take his life, if communicated to defendant shortly before a meeting which resulted in the shooting of another of such associates in the presence of those who made them, are competent in support of the plea of insanity, and may have contributed materially to the dethronement of a reason already tottering towards mental and moral irresponsibility and may have an important bearing upon the finding of the jury upon the question whether defendant was mentally responsible at the time he fired the fatal shot; and to exclude a proffer of such threats is reversible error.

6. ———: ———: **Eccentric and Unusual Acts.** In a prosecution for murder in which the defense is insanity, any testimony which can be said to have any legitimate tendency to throw light upon defendant's state of mind, especially testimony tending to show that his conduct was unusual and eccentric, is admissible. Testimony of a tailor tending to show defendant's eccentricities and peculiarities and instability in his selection of clothes and having them fitted; that he endeavored to buy suits to match shoes, hose, ties, and even horses; that he would give an order and then change or countermand it, and that he noted a worried look upon defendant's face at times, should be admitted in support of the plea of insanity.

7. ———: ———: **Suicide of Relatives.** Suicide does not, of itself, prove insanity, nor create a presumption of insanity, but suicide may be shown, in connection with other evidence, to show insanity; but in the absence of proof of other facts tending to show that blood relatives of defendant were insane, it is not error to exclude evidence tending to show that their deaths were suicide.

8. ———: ———: ———: **Certificates from Other States.** Certificates from another state, reciting that suicide was the cause of the deaths of blood relatives of defendant, in the absence of proof that records of suicides were required by the laws of such state to be kept, and in the absence of sufficient certification of such certificates under the act of Congress, are not admissible to prove that such relatives committed suicide.

9. ———: ———: **Near and Collateral Kindred.** Proof that near kindred of defendant, such as parents, brothers or sisters, were insane, is competent as evidence of defendant's insanity; but the insanity of collateral relatives is incompetent to establish his insanity.

Corpus Juris-Cyc. References: Criminal Law, 16 C. J., Section 1081, p. 557, n. 69, 72; p. 558, n. 98; Section 1520, p. 739, n. 86; Section 1540, p. 751, n. 99; Section 1545, p. 754, n. 55; 17 C. J., Section 3682, p. 337, n. 27. Homicide, 30 C. J., Section 451, p. 21, n. 25; Section 452, p. 222, n. 41. Witnesses, 40 Cyc., p. 2444, n. 53.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

REVERSED AND REMANDED.

*Ira B. McLaughlin* for appellant.

(1)   The court erred in excluding relevant, competent and material evidence, consisting of the impressions and opinions of lay witnesses as to basic facts concerning the acts, conduct and mental and physical condition of the defendant.   State v. Porter, 213 Mo. 43; Chenoweth v. Sutherland, 141 Mo. App. 272; McKelvey on Evidence, Hornbook Series (3 Ed.), p. 260, sec. 137; State v. Speyer, 194 Mo. 459; State v. Buechler, 103 Mo. 203; State v. Myers, 198 Mo. 225; State v. Stewart, 274 Mo. 649, 204 S. W. 10; State v. Ferguson, 278 Mo. 119, 212 S. W. 339; State v. Comer, 296 Mo. 1, 247 S. W. 179; Hartman v. Fleming, 264 S. W. 873; Godfrey v. Light & Power Co., 299 Mo. 472, 253 S. W. 233; Roach v. Railways Co., 228 S. W. 250; Lilly v. Railways Co., 209 S. W. 969; State v. Ramsey, 82 Mo. 133; Rearden v. Railroad, 215 Mo. 105; Commonwealth v. Borasky, 214 Mass. 313; Nash v. Hunt, 116 Mass. 237, 251; Green v. State, 64 Ark. 523; Cicero & Proviso St. Ry. v. Richter, 85 Ill. App: 591; Raisler v. Springer, 38 Ala. 703, 82 Am. Dec. 736; Reeves v. States, 96 Ala. 33; Martin v. State, 90 Ala. 602, 24 Am. St. 844; La Plante v. Cotton Mills, 165 Mass. 487; Vannest v. Murphy, 112 N. W. 236, 135 Iowa, 123; Burney v. Torrey, 100 Ala. 157, 46 Am. St. 35.   (2)   The court erred in excluding from the jury competent, relevant and material evidence concerning:   (a)   The acts and conduct of Housh and Clubb at Pahaska teepee and the effect thereof upon the defendant's nervous organization;   (b) the report made to the defendant by his son, relative to the activities of Housh and Clubb at Kansas City, which were adverse to the defendant and his business interests and the effect of said report upon defendant's nervous organization.   State v. Porter, 213 Mo. 43; State v. Liolios, 285 Mo. 1, 225 S. W. 946; State v. Kring, 64 Mo. 591; State v. Flanney, 112 Pac. 630, 61 Wash. 482.   (3)   The court erred in striking out and instructing the jury to disregard the entire testimony of the witness Carlson.   State v. Flanney, supra.   (4)   The court erred in excluding evidence tending to prove that four members of the defendant's immediate family suicided.   7 Ency. Evidence, p. 446, sec. 1 B; 1 Wharton & Stille's Medical Jurisprudence, sec. 669; 5 Wigmore on Evidence (2 Ed.) sec. 2500; Ritter v. Life Insurance Co., 69 Fed. 505; Frary v. Gusha, 59 Vt. 257; State v. Simms, 68 Mo. 305; 3 Wigmore on Evidence (2 Ed.) secs. 1502, 1501; R. S. 1919, sec: 5816; Simpson v. Wells, 292 Mo. 301, 237 S. W. 520; Griffith v. Continental Cas. Co., 299 Mo. 426, 253 S. W. 1043; Connecticut Mutual Life Insurance Co. v. Akens, 1509 U. S. 468.

*North T. Gentry,* Attorney-General, and *A. M. Meyer,* Special Assistant Attorney-General, for respondent.

(1)   The court did not err in excluding the conclusions of witnesses, drawn presumably from their observations, as to the characteristics or apparent mental condition of defendant at certain times. (a)   All of the evidence excluded, was cumulative only.   State v. Lamb, 141 Mo. 298, 21 A. L. R. 336 n; State v. Whitten, 68 Mo. 92; State v. Miles, 253 Mo. 427.   The defendant was not therefore, prejudiced by its exclusions, even if it was admissible.   State v. Morris, 263 Mo. 349.   (b)   The evidence excluded was not of the type of conclusions which must be legally considered as basic facts, but were conclusions in the legal and in the popular senses.   State v. Schlichter, 263 Mo. 578; State v. Evans, 267 Mo. 163, 183; State v. Kozlicki, 241 Mo. 301, 306; State v. Bronstine, 147 Mo. 520; State v. Wertz, 191 Mo. 569; State v. Davis, 225 S. W. 709; State v. Morris, 263 Mo. 339.   (2)   The court did not err in excluding from the jury acts and conduct of witnesses Housh and Clubb at Pahaska Camp during the summer of 1924, nor the report made to the defendant by his son relative to the activities of these witnesses at Kansas City.   (a)   These activities and acts, if any, were too remote in point of time.   State v. Tarwater, 293 Mo. 286.   (b)   They were not relevant to the question of defendant's ability to distinguish right from wrong at the time of the homicide.   The question is not what made defendant insane, but was he insane?   State v. Morris, 263 Mo. 348.   (c)   As to the communicated threats, offered to be proved by defendant's son, the doctrine has no application to the defense of insanity although it might be competent on the issue of self-defense. Again the relevant inquiry is not, what caused the defendant's mental condition, but, whether or not it existed at the time of the crime?   State v. Morris, 263 Mo. 348.   (3)   The defendant was not harmed by the withdrawal of the testimony of the witness Carlson from the consideration of the jury.   His testimony had no tendency to show that defendant was insane; neither did the witness show any intimate acquaintance with defendant, testifying that he saw defendant two or three times a year.   State v. Soper, 148 Mo. 234.   (4) The court permitted defendant to testify as to his mother's death from nervous diseases and melancholia.   It having been shown that defendant was not present at his father's death, he was not permitted to testify as to what he had been told concerning him.   Offered evidence, showing the cause of death of an uncle and cousin on his mother's side, was excluded.   No offer to show the cause of death of defendant's brother was made.   Even direct proof of hereditary insanity in an uncle and a cousin of defendant, would not be admissible, because insanity of collateral ancestors or relatives is not proof

of insanity in the defendant. State v. Baker, 246 Mo. 373; State v. Soper, 148 Mo. 234; State v. Pagels, 92 Mo. 307. As to all of the four instances mentioned, the testimony offered was hearsay and properly excluded as such, since the fact of insanity, whether of defendant or of members of his family, is not within the pedigree exception to the hearsay rule and may not be proved by hearsay testimony. 16 C. J. secs. 1236, 1238, p. 625; State v. Charles, 124 La. 744, 18 Anno. Cas. 934; State v. Brooks, 6 Ga. 292; State v. Penna, 35 Mont. 536, 90 Pac. 790; State v. Lagoni, 30 Mont. 482, 76 Pac. 1044; People v. Koerner, 154 N. Y. 355; Bruce v. State, 72 Tex. Crim. 221, 162 S. W. 874. The exhibits offered, purporting to be the records of various institutions in other states, were properly refused because it was not shown that they were records kept and required to be kept under the laws of the respective states. The statutes should have been offered in evidence. State v. Pagels, 92 Mo. 310; State v. Tarwater, 293 Mo. 281.

BLAIR, J.—Appellant was convicted of murder in the second degree; was sentenced to imprisonment for fifteen years, in accordance with the verdict of the jury, and appealed to this court.

Appellant shot John C. Deskins with a German Luger pistol at a meeting of the trustees of the Mutual Rocky Mountain Club, held in one of the offices of the Scarritt building in Kansas City, on October 13, 1924. Thereupon appellant fired a shot into his own body, inflicting a dangerous wound near the heart, in an unsuccessful attempt to take his own life. Deskins died two days later as a result of said shooting.

The facts immediately attending the shooting are not in dispute. The sole defense offered was the alleged insanity of the appellant. Most of the voluminous record is filled with testimony bearing upon the issue of the mental responsibility of appellant at the time of the shooting. No contention is made in this court that the evidence was not sufficient to support the verdict of the jury. Nor is complaint made of the sufficiency of the indictment or the verdict or the propriety of the judgment rendered thereon, save as the judgment is attacked on the ground of alleged procedural errors. Even the instructions are not assailed in the brief of able counsel representing appellant in this court.

The testimony of appellant and his witnesses tended to show that, as a child of three, he suffered brain fever. He was twice kicked on the head by horses while a small child and suffered concussion and protracted unconsciousness. He suffered excessively from headaches from childhood to the time of the homicide, and much of the time could only get relief by having his father or others press both hands against the sides of his head. He sometimes even had spasms. Dur-

ing his spells of headache, appellant was confined to a darkened room and demanded absolute quiet. The evidence tended to show malformation of appellant as to head, ears and hands. This fact was pointed to by appellant's insanity experts as some evidence of paranoia. The State's experts, on the other hand, repudiated the evidentiary value of such facts.

Appellant's father died as the result of self-administered poison when appellant was thirteen years old. His mother died as a result of melancholia and headaches. Proof was offered tending to show that certain blood and collateral relatives committed suicide, but the same was excluded.

Appellant was forty-five years of age at the time of the trial. At seventeen years of age he became a messenger in a bank and made some advancement. At twenty-one years of age he went to North Dakota and lived on a claim. At twenty-two he became assistant cashier in a bank. Thereafter he married and became the father of two sons, both being alive at the time of the trial. Afterwards he attempted, but failed, to organize a bank. He later succeeded in organizing a bank at Gardiner, Montana, and became its cashier. He held that position three or four years. After trouble with one of the bank's customers and a physical assault upon such customer, appellant left that bank and that community. He later served as deputy bank commissioner of North Dakota. After that he entered the mercantile business, which apparently prospered. He then had trouble with his wife and her mother, which resulted in his permitting her to have a divorce, while appellant kept the custody of the two sons.

After said divorce appellant appeared to be in bad health and drifted around from place to place. Later he became an insurance agent in St. Louis and remarried in that city. The marriage proved unsuccessful and he was divorced by his second wife.

In 1914 appellant went to Kansas City and became general agent for the Connecticut Mutual Life Insurance Company, with several counties included in his territory. He maintained that connection for about six years. In 1916 he married his third wife, of whom he seemed very fond. Her death in childbirth in 1921 and the attendant loss of the child caused appellant intense grief and he did no work for at least a year. His health and spirits were both at low ebb during that year.

Appellant's evidence tended to show that he was emotional and nervous. He would be on the mountain top one day, in fine spirits, mentally exalted, self-satisfied and boastful. The next day he would be down in the valley of despondency, grovelling in the depths, morose, melancholy and even weeping. He had threatened suicide on occasions previous to the homicide. He was suspicious. He always

laid his misfortunes in business and loss of employment to double dealing and the persecution of others.

Appellant was exceedingly fastidious, eccentric and almost effeminate in dress and personal habits. He gave orders for suits of clothes to match shoes, ties and other articles. He wore suede shoes. He changed his mind capriciously and frequently countermanded or changed his orders. He appears to have been very sensitive to discordant sounds. He complained of noises which were not noticed by others. He was known to throw articles at imaginary cats, and even fired his pistol out of his bed-room window at invisible dogs and cats, which he claimed were disturbing his rest by their noises. Even the billing and cooing of pigeons, which were not noticed by others, jarred on his sensitive nerves.

Appellant would frequently burden others with his woes when he was suffering with headaches or periods of mental depression. He would complain that his business associates and others were perecuting him and treating him unfairly. He would often cry over his troubles. At other times, when he was in a state of mental exaltation, he would boast of his financial prowess and would brag about his bright prospects of making a great fortune. His successes were always due to his own superior genius. His failures and disappointments were never occasioned by his own want of ability, foresight or industry. He attributed his failures to double dealing and unfair tactics of those who were persecuting him and trying to take advantage of him and rob him of the fruits of his genius.

In sketching thus broadly, as we have done, the evidence offered by appellant upon the question of his insanity, we have not attempted to go literally into the evidence, but only to state its general effect. In short, the evidence offered by appellant, if it had been accepted and believed by the jury, justified a conclusion as stated by one of appellant's witnesses, that appellant was "nutty as a hazel bush." A finding at the hands of the jury that appellant was a physical and mental wreck, incapable of caring for himself and an unwitting menance to society, totally irresponsible and incapable of knowing right from wrong, was authorized by appellant's evidence.

Numerous lay witnesses called by appellant testified to acts and conduct of appellant coming within their observation, and to their belief therefrom that appellant was insane and incapable of knowing right from wrong at the time he fired the fatal shot. Other lay witnesses, produced by the State, were equally positive that appellant was sane. Appellant produced three expert alienists. They had visited appellant in jail and had there talked with him and studied him. Counsel prepared and propounded a long hypothetical question detailing all of the facts we have above recited and others we fail to find in the record. Basing their answers upon the facts set

forth in such questions and upon their own information, which they had acquired by examining appellant, the three experts of appellant pronounced appellant insane when the shots were fired. They said he was insane at the time of the trial and would continue insane and should be confined in an institution. They classified his mental ailment as paranoia or delusional insanity.

The State offered two experts on mental diseases who arrived at exactly the opposite conclusion. In answer to the appellant's hypothetical question, which was adopted by the State, and from their own observation of appellant on the witness stand and at other times during the trial, they pronounced appellant sane, both at the time of the trial and at the time he committed the homicide.

In October, 1922, appellant conceived and organized the Mutual Rocky Mountain Club under a declaration of trust in which Deskins, the deceased, and two others, were designated as trustees. About four hundred memberships were sold to members of the Masonic order in Missouri and other states. Appellant became general manager and was permitted to handle the funds of the club largely in his own way. He had devoted his time and energies to the promotion of the club largely without salary.

A loan of $25,000 for the use of the club was procured from one Ike Clubb, of Oklahoma, through the work and influence of one of the members, H. B. Housh. Later on Housh became one of the trustees. With such a large loan, Clubb naturally exerted considerable influence and became interested in the way the hunting club was managed. Housh took it upon himself to look after Ike Clubb's interest. In doing so he clashed with appellant. Housh wrote letters to the other trustees seeking to get from appellant an accounting of his stewardship, and even suggesting his removal and prosecution for embezzlement. At one time Clubb drew a weapon upon appellant and threatened him with serious physical injury or death.

Again, and with considerable reason for it, if his evidence was believed, appellant went about telling his troubles and declaring that Housh and Clubb were trying to beat him out of the management of the hunting club, which had become the pride of his life. He said he did not care to live if he could not go on with the club. Appellant even charged that his own cousin was in league with his enemies against him.

In the fall of 1924 accountants were employed to go over the books and determine just how the club stood. Later the three trustees and appellant met with the accountants. It appears that each of the trustees and appellant were represented by his own counsel. Questions were asked of appellant. He claimed that he could account for all moneys collected. In justice to him, it is conceded in the record and should be stated here that no evidence of defalcation or

dishonesty on the part of appellant was discovered. Evidently the financial troubles of the club could be justly laid to loose management or mismanagement.

Deskins, the deceased, had been a trustee of the club from the beginning, and had always been regarded by appellant as the best friend he had among the trustees. Deskins appears in the record as a man who tried to do his duty by his club, regardless of his friendship for appellant. Meetings of the trustees, the accountants, the different attorneys and the appellant, had been frequently held for several days in an endeavor to straighten out the affairs of the club.

Finally, on the afternoon of the tragedy, a resolution had been prepared for adoption by the trustees, charging appellant with responsibility for mismanagement and even defalcation, and ordering his discharge as general manager of the club. Deskins, who had previously been the friend of appellant, had seemingly concluded that appellant was at fault. He was delegated to present the resolution. A meeting had been held in the forenoon in a different office in the same building. Just after the noon hour, the meeting was resumed; but this time it was held in the law office of Attorney Kelley, who, by the way, was not present. Appellant's counsel was called by telephone at his office in the same building and was asked to come down. It appears that a suggestion had been made that appellant should not be present. It at least appears that his presence was not expected.

Deskins arose to present the resolution fixing the responsibility upon appellant and ordering his discharge. He had partially read the resolution when appellant and his son appeared at the door and appellant announced that he would like to be present and entered the room. Appellant was carrying an overcoat over his arm at the time. It was suggested that, as appellant had come in, Deskins should read the resolution from the beginning again. Appellant sat through the reading of the first part of the resolution and even smiled at his friend Eugene Briggs. But, as the reading progressed to the point where appellant was charged with the defalcation of the club's funds, appellant rose to his feet and, exclaiming, "It is a damnable lie," fired five or six shots from a German Luger pistol. His face then had become exceedingly pale. Trustee Towner and Housh were sitting directly behind Deskins and some of the shots were very close to them. From an inquiry made by appellant, after he had shot himself, and from the proximity of some of the shots to Towner and Housh, it appears that appellant endeavored to kill all three of the trustees, as well as himself. Appellant snapped the pistol twice at his own head without discharging it and then adjusted it before he fired a bullet into his left breast with suicidal intent.

I. The first complaint with respect to rulings on the evidence is the exclusion of alleged "relevant, competent and material evidence, consisting of the impressions and opinions of lay witnesses as to the basis facts concerning the acts, conduct, and mental and physical condition of the defendant."

**Basic Facts.**

The appellant has cited a number of instances of such rulings in his brief, supporting (as alleged) this assignment of error. We have faithfully examined each of these. Without discussing each instance, which would extend this opinion to an unjustifiable and almost interminable length, we have become thoroughly convinced that no reversible error was committed by the court in any of the rulings complained of under this assignment.

To read come of the excerpts in appellant's brief, the opposite conclusion might be hastily reached. But, when all the record touching the incident has been carefully examined, it appears that appellant was not unduly or improperly prejudiced by the rulings complained of. Testimony of the witnesses as to their opinions of the real or actual state of mind of appellant clearly was not proper. We know of no authority supporting the admissibility of opinion evidence as to the actual state of mind of another person. It was proper (and the court admitted such testimony) to show the opinion of the witnesses, based upon the appearance and conduct of the appellant. Such testimony properly went to the apparent state of mind of appellant.

In other instances, where evidence may have been improperly excluded on the face of the record quoted by appellant, further examination has satisfied us that the excluded testimony actually got into the record on later examination of the same witness. Counsel could hardly be expected to print all of such testimony because to do so would extend the brief interminably and very expensively. Nor can we set it out at length sufficient to demonstrate the actual state of the whole record without unjustifiably extending this opinion.

All of the lay witnesses, who were questioned upon the subject, were permitted to go into the details of acts and conduct of appellant which appeared to them to be out-of the ordinary. They were permitted to testify to his apparent state of mind, based upon their observations of his appearance, acts and conduct. Based upon the testimony given concerning such appearance, acts and conduct, they were permitted to testify to their opinions concerning the sanity or insanity of appellant.

Considering the record as a whole, we are convinced that the trial court gave to counsel for appellant all the wide latitude in the examination of the lay witnesses to which appellant was fairly entitled. His plea of insanity entitled him to a very wide latitude indeed in bringing to the attention of the jury the most trivial acts and conduct on his part, together with things said by him, which had

any legitimate tendency to throw light upon his ability to distinguish between right and wrong conduct on his part in firing the fatal shot. Without entering into tiresome details, we rule that the trial court did not commit reversible error in respect to Assignment II, which complains of the court's rulings on the exclusion of impressions and opinions of lay witnesses as to basic facts concerning the acts, conduct and mental and physical condition of appellant.

II. (A) Another assignment of error is that "the court erred in excluding from the jury competent, relevant and material evidence concerning: (a) the acts and conduct of Housh and Clubb at Pahaska teepee and the effect thereof upon the defendant's nervous organization; (b) the report made to defendant by his son, relative to the activities of Housh and Clubb at Kansas City, which were adverse to the defendant and his business interests and the effect of said report upon defendant's nervous organization."

Part of the complaint under subhead "(a)" has already been covered in our consideration of the previous assignment. The testimony complained of under this head is set out in appellant's brief as follows:

**Conclusions and Facts.**

"Q. What your father and Housh said to each other and their conduct towards each other. A. Well, they became very antagonistic.

"MR. HANNA: I move that it be stricken out for the reason it calls for a conclusion of the witness.

"THE COURT: Sustained.

"Q. Did they have any words or quarrel about it?.

"MR. HANNA: That is calling for a conclusion of the witness and objected to for that reason.

"THE COURT: Sustained. . . .

"Q. As soon as your father got back, what was the conduct of Mr. Clubb? A. He withdrew himself from him.

"MR. HANNA: Just a minute, that is objected to as calling for a conclusion of the witness, being too general, indefinite, immaterial to any issue in the case.

"THE COURT: Sustained.

"Q. Now, tell, after your father's return, after he was away these few days, what Clubb did or said, what your father did or said, that would show their relationship? A. My father and Mr. Clubb were staying in a cabin across the river, known as Chapauton Cabin. Upon his return, while he was there, Mr. Clubb had left it and moved over to Pahaska teepee and was seemingly, or did not seek my father's company or talk to him.

"MR. HANNA: I move that that be stricken out as a conclusion of the witness.

"THE COURT: Sustained.

"Q. What did your father do? A. Well, he became very worried, very excited.

"Mr. Hanna: Just a minute, that is objected to as being a conclusion of the witness, and I ask that it be stricken out and the jury instructed to disregard it.

"The Court: Sustained.

"Q. Just tell what you saw him do and say? A. He went over to the cabin; he said it was the last place he ever—the last person on earth he ever expected to cause him any trouble in this organization; that he had thought Mr. Clubb was a very good friend of his and that he believed he still would have been had not Mr. Housh interfered with Mr. Clubb. He did not want me to leave. I was supposed to leave that day. He did not want me to leave.

"Mr. Hanna: Now, if Your Honor, please, the State asks that this answer be stricken out and similar answers, for the reason that it is immaterial to any issue in the case; it is immaterial, has no bearing whatsoever on sanity or insanity.

"Mr. O'Sullivan: It goes to show the condition of the man's mind prior to the time of the alleged offense.

"The Court: Sustained.

"Mr. O'Sullivan: Defendant offers to prove by the witness further that these two separate assaults made upon the defendant by Ike Clubb at the location of the Rocky Mountain Club at Pahaska teepee in Cody, Wyoming, worried the defendant and caused him anxiety."

The trial court was clearly right in ruling that the witness's answer that the conduct of appellant and Housh "became very antagonistic" was a conclusion. Besides, the answer was not responsive to the question. The record omitted by appellant discloses that on further examination said witness was permitted to detail all of the facts from which the jury could draw for itself the conclusion to which the witness undertook to testify. The same may be said of the conduct of Ike Clubb and its effect upon appellant after he got back to the camp at Pahaska teepee. Appellant's son was permitted to testify in minute detail concerning the acts and conduct of his father which would enable the jury to determine whether appellant was "worried" or "excited," concerning which the witness undertook to testify as a conclusion.

(B)    But we regard as much more serious the second part of the complaint under sub-head "(b)." The court excluded an offer made by counsel which, if testified to by the witness and believed by the jury, might have had much to do with the character of

**Threats.**     the jury's finding in reference to the mental responsibility of appellant when he fired the fatal shot. The record shows the following:

"MR. O'SULLIVAN: I offer to prove by the witness that upon his arrival at Pahaska, and upon his leaving Kansas City, he went for the specific reason of telling his father of the threats against his father that had been made by Housh and Clubb, which threats by Housh and Clubb included charging his father with some conduct unbecoming a Mason, and also which threats included the charge, or attempted charge, of his father with the crime of embezzlement, and also included threats to take the life of his father; and this witness went to Pahaska Camp, communicated these threats to his father, which threats, we claim, after being communicated to the father, caused a change in the condition of the mind and go to show the condition of the mind prior to, leading up to and at the time, shortly prior to the meetings which culminated in this homicide. . . ."

The court ruled that there was no testimony that any one had threatened to do harm to the appellant and also ruled that such testimony was not competent on a plea of insanity, although it might be competent on a plea of self-defense. The offer was excluded. We think this was error. Under the offer it was proposed to show by appellant's son as a witness that threats had been made by Housh and Clubb that they would prefer charges against appellant of "conduct unbecoming a Mason" (a charge calculated greatly to disturb a true Mason), and also threats that they would "charge or attempt to charge" appellant with embezzlement and also even threats to take the life of appellant. The offer included proof that all such threats were communicated to appellant by his son. It was the alleged communication of such threats to appellant and the effect of such communication upon him, and not the actual making thereof, which was important on the issue of appellant's insanity.

Threats to prefer charges against appellant in the Masonic order and to file criminal charges against him did not require a plea of self-defense to make them admissible in evidence. Such threats, together with a threat to kill the appellant or do him great bodily harm, communicated to appellant, might contribute very materially to the dethronement of reason already tottering toward mental and moral irresponsibility.

We are at a loss to understand the theory of the trial court in refusing to permit appellant to make proof in harmony with this offer. The effect the knowledge of such threats might have upon appellant's reason, in view of all the other testimony bearing upon and tending to show his insanity, was for the jury to determine.

In State v. Porter, 213 Mo. 43, paragraph 9 of the Syllabus, it is said: "Great latitude is allowed in an investigation of the subject of insanity where it is interposed as a defense in a criminal prosecution. Evidence of anything and everything which in some substantial way would tend to show that defendant's nervous organization

was affected should be admitted." The body of the opinion amply justifies this terse and comprehensive headnote of our Reporter stating the general rule. See also State v. Tarwater, 293 Mo. l. c. 293; State v. Morris, 263 Mo. l. c. 348.

III. Error is assigned to the action of the trial court in striking out and instructing the jury to disregard the entire testimony of witness Carlson. This witness was employed by one Moon, a tailor who made clothes for appellant. Carlson testified to his acquaintance with appellant acquired when he came to the shop to buy clothes. His testimony tended to show the peculiarities and eccentricities of appellant and his instability in the selection of clothing and having the same fitted. The witness testified about appellant's efforts to buy suits of clothing to match shoes, hose, ties and even a horse. He said that appellant would give an order and would then change it or countermand it; that he noted a worried look upon appellant's face at times. Upon motion of the State, and over the objection and exception of appellant, all of the testimony of this witness was stricken out, on the ground that it had no bearing on any issue in the case.

**Eccentricities.**

We think the testimony was properly for the consideration of the jury. It tended to show peculiarities and unusual acts in appellant's conduct which had some bearing on the soundness of his mental processes. Other testimony to the same effect given by tailor Moon and others was left in the record. It is not now necessary to determine whether the action of the court in striking out this part of the testimony was reversible error, because the judgment must be reversed for other reasons. Upon retrial, the court should be careful not to strike out or refuse to admit any testimony, such as the testimony now being considered, which can be said to have any legitimate tendency to throw light upon appellant's state of mind, especially testimony tending to show conduct on his part which was unusual and eccentric.

IV. Another general assignment is that the court erred in excluding evidence tending to prove that four members of appellant's immediate family committed suicide. The fact that appellant's father committed suicide got before the jury.

**Suicide.**

Appellant offered what purported to be certificates of death from other States, which undertook to give the causes of death of appellant's brother, uncle and cousin. The court excluded such certificates. The ruling was doubtless correct upon the showing made and in the absence of any proof of the statutory requirement of the states, from which such certificates issued, showing that the particular records were required by law to be kept (Simpson v. Wells, 292

Mo. 301), and in the absence of sufficient certification of such death certificates under the Act of Congress to make them admissible in evidence. Appellant also sought unsuccessfully to show the causes of death of such relatives by means of what counsel termed "family tradition."

As the case must be retried, it is deemed necessary to determine whether or not such certificates, if otherwise properly receivable in in evidence, or other evidence of such causes of death, are material as tending to prove any facts which are relevant and material to the issues in the case at bar. In 7 Encyclopaedia of Evidence, page 446, cited by appellant, it is said: "Suicide does not, of itself, prove insanity, nor does it create any presumption of insanity, but self-destruction may be proved, in connection with other evidence, to show insanity."

Other cases cited by appellant are to the same effect. For example, appellant quotes from Ritter v. Mutual Life Ins. Co., 69 Fed. l. c. 508, where it is said that "suicide may be used as evidence of insanity, but, standing alone it is insufficient to establish it."

The mere fact that blood relatives of appellant committed suicide, standing alone, is not sufficient to prove the insanity of the particular relative at the time of such suicide. In the absence of proof of other facts tending to show that the particular blood relative was insane, we do not think the trial court erred in excluding either the formal certificates of death (if they had otherwise been admissible in evidence) or other proof offered tending to show only the fact of such deaths by suicide. Proof of the suicide of blood relatives, when properly made, in connection with other facts having a tendency to show the insanity of such blood relatives, is proper evidence to aid in establishing the fact of the insanity of the appellant.

Upon another trial appellant should be permitted to show, if he can, that blood relatives were insane and committed suicide as a circumstance, in connection with other proof on that subject, tending to show his own insanity at the time of the homicide for which he is on trial.

The case of State v. Simms, 68 Mo. 305, 1. c. 309, cited by appellant, tersely puts the reason for the rule permitting a showing of the fact that he had insane relatives by one seeking to establish his own insanity as a defense to the charge of having committed a crime. We quote from it as follows: "An act which would not indicate the insanity of a person in whose family there had been no case of insanity, might be a very strong circumstance to prove insane a person whose aunt had died in a mad-house, and two of whose sisters were maniacs."

However, proof of the insanity of collateral relatives is expressly held inadmissible in this State. [State v. Pagels, 92 Mo. 1. c. 307; State v. Soper, 148 Mo. 1. c. 234; State v. Baker, 246 Mo. 1. c. 373.]

See also 16 Corpus Juris, 558, for a statement of the general rule, with which the rule announced by the decisions of this State seems to be in full accord. Proof of the suicide of a collateral relative, together with other facts tending to show the insanity of such relative, certainly would not be admissible as bearing upon the insanity of the appellant in the absence of proof tending to show that such insanity was inherited from an ancestor which appellant and such collateral relative have in common.

We have carefully gone over the assignments of error made in the brief of able counsel, except the error contended for in the retention of a juror upon the panel of qualified jurors. As such alleged error will scarcely appear upan a retrial, it is unnecessary to give further consideration to that assignment.

For the errors pointed out, the judgment is reversed and the cause remanded for another trial.    *White, P. J.,* concurs; *Walker, J.,* dissents.