THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* DOROTHY SHERWOOD, Appellant.

(Argued May 26, 1936; decided July 8, 1936.)

*Stanley B. Johnson* and *William L. Browning, Jr.,* for appellant.

*Henry Hirschberg, District Attorney,* for respondent.

CROUCH, J. The defendant stands convicted of murder in the first degree. On the date of the homicide she was twenty-seven years of age. The victim was her own infant son aged two years and three months. On August 20, 1935, under circumstances hereinafter to be stated, she put the child in his carriage, walked three and one-half miles from her lodging place to a secluded spot off the main highway, and, in a small pool of water eight inches deep, held his head under water until he was drowned.

The sole defense was that at the time of the crime she was laboring under such a defect of reason as not to know the nature and quality of the act or that the, act was wrong. It is now urged that the verdict was against the weight of the evidence, and that it was rendered under misapprehension of the applicable law because of erroneous instructions.

We cannot say that the verdict was against the weight of the evidence. The defense and the prosecution each swore two qualified psychiatrists who expressed contrary opinions as to the mental state of the defendant in answer to hypothetical questions which were not substantially different. Under such circumstances, argument based upon scattered gleanings from the cross-examination of the People's experts, must fail in an appellate court to demonstrate that the weight of evidence on the issue

of insanity was with the defense. The jury could accept or reject the opinion of any expert. (*Dougherty* v. *Milliken*, 163 N. Y. 527, 533.)

The serious question is whether the conclusion which was reached can or ought in justice to stand. Technical legal error there was in instructions to the jury, which may or may not have affected the result. Error also there was in an incident of the charge, which, whether it be called technical legal error or not, did almost beyond doubt affect the verdict. Under such circumstances we think the verdict should be set aside.

The claim of the defense was that the mother killed the child because she had become obsessed with a delusion that in death alone could there be safety and freedom from pain, suffering and misery for her son. The time has gone by when such a claim could seem fantastic, either to judge or juror. While we still — and rightly — accept the validity of such claims with the utmost caution, we nevertheless know now that they may be valid. The claim here rests upon evidence which, on the one hand, neither discloses nor even suggests any rational motive for the tragic act; and, on the other hand, does build up a personality which might well crack and crumble under the hard blows which fate, within a brief period, dealt it. Born of indifferent stock in a small western town, the defendant at nine years of age had lost her mother. For a time she was in an orphanage, and then for a period served her itinerant father and his successive wives as a household drudge. There followed a period of a few years when she lived at various places in the middle west with a succession of Salvation Army families, doing household and other work, and getting some scattered and interrupted schooling. Following that insecure and sorry young girlhood, she commenced when about sixteen years old to earn her own independent way. Shortly she went on the stage as a chorus girl with traveling companies. When she was nineteen years old she met and married her husband, a stage electrician, whose job, like her own, kept

him moving from place to place. Within a year a baby girl was born. The couple finally came to rest in Newburgh on the Hudson, where the man secured a job with a moving picture house. After a period of comparative peace and security, what small prosperity had come to them was ended by the illness of the husband. Early in 1933 the boy baby was born. The evidence of the doctor who attended the defenant and of the nurse at a pre-natal clinic, shows clearly that the child was not an unwanted one. On the contrary it was desired, welcomed, and after birth was lovingly and carefully attended to and looked after. The husband's illness developed into tuberculosis. The home, the only one the defendant had ever known, was broken up. He went to a sanitarium, the little daughter was taken by the mother-in-law, and the defendant with the infant son went to a lodging house, the landlady of which looked after the child while the defendant, as her sole means of support, worked as a waitress in a restaurant. In April, 1935, her husband died. Several months later the defendant met a man who, after a time, offered to provide a home for her and her son, to marry her and to educate the boy. On a day fixed they were to leave Newburgh for a new home in the west. She gave up her job. She made ready to go. The day came but not the man. She waited until she realized she had been deceived. She tried to get work and failed. Without a job, without means, she and her little son were evicted by the landlady — though the latter denied that — and thereupon was committed the act for which her life is forfeit. A laconic statement made to the police the same day tells the story: " My husband, Fred Sherwood, died about four months ago, and since that time I have found it very difficult to make a living for myself and my two children, Dorothy, aged seven, and James, aged two. This afternoon, August 20th, 1935, shortly before twelve o'clock noon I took my younger child, James Sherwood, in a stroller down to Caesar's Lane at New Windsor, New York. There is a very shallow brook

there and I let him wade in the brook until he seemed to get tired of it, and then I picked him up in my arms and held him under water for about half an hour. During this period of time his head was completely covered with water. I picked him up then, put a clean suit on him and held him in my arms for some time. * * * Later I walked up to the state road and was given a ride to the City of Newburgh. After I got into the City I walked into Police headquarters and told the lieutenant at the desk what I had done."

During the ride back to town she carried the dead child in her arms. In that fashion she entered police headquarters. The lieutenant of police in charge testifies: " In a low monotone voice she came up alongside of my desk and said to me, ' Here he is.' * * * I said, ' You killed him? ' She said, ' Yes, I drowned him.' I said, ' Where did you drown him? ' She said, ' In Caesar's Lane.' I said, ' What did you do that for? ' She said, ' I couldn't take care of him any longer and I thought he would be better off dead.' "

At no time was there the slightest evidence of emotion, except for a moment when, taken back to the scene of the crime, she was " teary-eyed " at the sight of the wet, discarded baby clothes; nor was there ever the least sign of regret or of doubt that she had acted for the best, as she regarded it. That the defendant knew what she was doing — the nature and quality of the act — although perhaps a matter of small doubt to the lay mind, was still an issue because both experts called as witnesses by the defendant denied that she had such knowledge. That she knew it was wrong was, when the case went to the jury, open to serious and substantial doubt. (*People* v. *Schmidt*, 216 N. Y. 324, 338, 340.) It was of the utmost importance, therefore, that the law as respects criminal responsibility under section 1120 of the Penal Law, should have been made clear to the jury.

In the main charge it was not made clear that a defect of reason which inhibited a knowledge *either* of the nature and quality of the act *or* that the act was wrong, excused

a person from criminal liability. At various points the two matters were referred to in the conjunctive, with the word " and " instead of the word " or." The error was called to the attention of the court at the close of the main charge, and the court said merely: " If I made that error, I so charge." Left in that way, the distinction might doubtfully be considered as having been made clear. But thereafter — and it was the court's last word before the jury retired — the court upon request charged that a mere false belief would not be sufficient to excuse her, " unless it was the result of some mental *disease* which prevented her from knowing the nature and quality of the act *and* that it was wrongful." Here was a repetition of the same error, complicated with a reference to " some mental disease," *i. e.*, some pathological condition, instead of a " defect of reason," as the statute reads. No disease, no pathological condition, existed or was claimed to exist. It may be doubted whether the jury had a clear conception of when a person is or is not criminally liable under section 1120.

Now we come to another and even more serious error. After the jury had deliberated on its verdict for five hours, it came into court and the following incident occurred: " The Court: Gentlemen, I understand you want an answer to the question, ' Does the law permit a recommendation of mercy? ' The Foreman: That's right. The Court: Of course, the law does permit a recommendation of mercy; does that answer your question? The Foreman: Yes."

The jury retired. Six minutes later it returned. The record then reads as follows: " The Clerk: Gentlemen of the jury, have you agreed upon a verdict? The Foreman: We have. The Clerk: How do you find? The Foreman: Guilty of murder in the first degree and recommend mercy. The Clerk: You say you find the defendant guilty of murder in the first degree and you recommend mercy? "

In the practical administration of justice in civil cases, courts necessarily assume that jurors live up to their oaths and that they are capable of and do perform extraordinary intellectual feats. (Cf. *Akely* v. *Kinnicutt*, 238 N. Y. 466, 475; *Crandall* v. *Leach & Co., Inc.*, 222 App. Div. 292.) Justice, rough perhaps but approximate, is wrought by the assumption. When, however, the stake is the life of a person conceivably innocent, courts may make that assumption only with a caution thrice guarded. We do not know how matters stood after five hours in the jury room. Where upon the evidence there may well have been doubt, we may assume that doubt, in some degree at least, existed. The jurors had been told by the district attorney in his summation that a grace of mercy by commutation rested in the Governor. That information, if it was to be given at all, should have been given by the court with appropriate explanation. It is difficult to conceive of any case, however, where it would be either necessary or proper to instruct a jury on the point. Coming as it did, it amounted to nothing less than an invitation to possible doubting minds and uneasy consciences, to solve their doubts against the defendant, and to salve their consciences with the thought that if they were wrong, executive grace might cure the error. When, after long hours, the jury came into court, it may be that there was a desire to be given assurance by the court of what the district attorney had said. Or it may be that assurance was desired of a common popular impression that a jury may recommend mercy and thereby perhaps minimize and soften the penalty which the judge would otherwise impose. The impression is a mistaken one. Under the law of this State the penalty for murder in the first degree is death. No power or discretion is vested in any judge or court to vary it. Whatever the motive of the jury's request may have been, the answer of the court removed all doubt and hesitation. The answer was wrong. The " law " expresses neither permission

nor denial. Probably the law would regard an uninvited or voluntary recommendation as surplusage. We need not say. Here the jury was in effect invited to go beyond its province and was erroneously told that the law permitted it to do so. The error almost certainly was prejudicial to the defendant. That being so, we need spend little time in an examination of cases in other jurisdictions which have dealt with more or less similar situations. In general agreement with the conclusion here reached are *State* v. *Kernan* (154 Iowa, 672); *State* v. *Kiefer* (16 S. D. 180); |*Hackett* v. *People* (8 Col. 390). (Cf., also, *People* v. *Santini*, 221 App. Div. 139; affd., 246 N. Y. 612; *contra, State* v. *Gill*, 14 S. C. 410.)

The judgment of conviction should be reversed and a new trial ordered.

CRANE, Ch. J., LEHMAN, HUBBS and LOUGHRAN, JJ., concur; O'BRIEN and FINCH, JJ., dissent.

Judgment of conviction reversed, etc.