[Crim. No. 1814. Third Dist. Feb. 9, 1943.]

THE PEOPLE, Respondent, v. MAX BABCOCK, Appellant.

S. E. Mettler for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant was charged with and convicted of the crime of robbery of the first degree. At the trial he entered a plea of "Not guilty by reason of insanity." The jury returned a verdict finding that he "was sane at the time of the commission of the offense" with which he was charged. Defendant's motion for a new trial was denied. The court determined that his crime was that of robbery of the first degree. He was thereupon sentenced to imprisonment at San Quentin. From the order denying a new trial and the judgment of conviction the defendant has appealed.

It is contended the verdict and judgment are contrary to law and that they are not supported by the evidence.

We are persuaded that, in spite of very convincing evidence of insanity of the defendant at the time of the commission of the offense, this court is bound by the contrary verdict and judgment which were rendered in this case in view of the decisions found in *People* v. *Chamberlain,* 7 Cal.2d 257 [60 P.2d 299], and *People* v. *O'Brien,* 122 Cal.App. 147 [9 P.2d 902]. In the Chamberlain case three expert medical witnesses and ten non-expert witnesses testified that the defendant was insane when he committed the homicide of which he was convicted. Chamberlain took the witness stand in his own behalf and his evidence strongly corroborated the other witnesses in that regard. There was no direct evidence to the contrary. He was found to be sane. The Supreme Court affirmed the verdict and judgment of sanity in that case, saying:

"We cannot say that the jury, observing the defendant in these particulars during the trial, with the entire evidence adduced at the trial in their minds, aided by the presumption

that the defendant was sane, did not have sufficient evidence on which to base the verdict in this case."

In the present case the evidence consists of the testimony of two medical experts and of the father of the defendant, together with a transcript of the evidence adduced at the preliminary hearing, including a lengthy examination of the defendant himself, and a transcribed statement of the defendant which was taken within a few days after the robbery occurred. The defendant's statement is clear, connected and rational. It contains no evidence of a deranged mind. In spite of the other evidence of the history of the case, together with the testimony of the medical experts, the jury may have been convinced, from the testimony adduced at the preliminary hearing and particularly from defendant's own statement that he was sane at the time he committed the robbery. Under the authorities above cited we may therefore not interfere with the finding of the jury.

The evidence shows that the defendant was a robust, healthy young man twenty-three years of age. He weighed 225 pounds. He was born in Nebraska. He had completed eight grades of school with a fair record. There is no evidence of subnormal intellect or deranged mind during his youthful days. For several years prior to the commission of the crime with which he was charged he lived with his father at Eureka, California. His mother and father had been previously divorced. His mother remarried and lived in the East. His father was a hard-working reputable citizen.

When Max Babcock was about fourteen years of age he sustained a serious injury to his spine by falling from a tree while he was playing "Tarzan" with some companions. After application of liniment and other treatment during the period of a month or so he appeared to recover from that injury. Later he avoided association with companions and lived a solitary life. He became reticent, timid, irritable and nervous. He was afflicted with insomnia. He was nevertheless obedient and industrious. He ate ravenously and worked hard. There is evidence that he often lay awake at night. He became violent and once assaulted his father without provocation, for which he later expressed regret. He was absorbed in an effort to invent a device to create perpetual motion. For that purpose he dug a well and experimented with a water-wheel, but became discouraged and blew up the well and apparatus with explosives. He bought a short-wave radio and spent

much time in listening to war reports from foreign countries. He read Communistic literature, war propaganda and Hitler's "Mein Kampf." He became excited and restless. He was anxious to take an active part in the turbulence of world affairs. He acquired delusions. He said he belonged to a "gang of spies." He claimed that he knew of a rendezvous of organized saboteurs, and that, with the aid of a large sum of money and the cooperation of the officers, he might capture them. He planned a series of holdups to raise the necessary money. He bought a revolver and started on a rampage. He told his father "he had to do something" and asked him to notify the police to follow him. He went to Eugene, Oregon, in July, 1941, and, going to the home of the mayor of that city, he attempted to rob him with the use of his revolver, but was frustrated. He fled in an automobile to Portland where he was arrested. After an examination he was committed as a victim of dementia praecox to the Oregon State Hospital for the Insane, but was subsequently paroled and placed in the custody of his mother. It does not appear that he was ever discharged from that institution. After several months had elapsed he returned to his home in Eureka. December 24, 1941, he armed himself with his revolver and entered several places of business in Eureka for the purpose of committing robberies. He went to the "Double-A-Bar" saloon and demanded money from the barkeeper. A bystander by the name of Edwards attacked him and Babcock shot him in the leg. He fled and went immediately to "Tiny's Lounge" where he fired two shots into the floor and demanded money from the bartender, Dick Myers, who promptly handed him $20 from the cash register. As he started to leave, a constable who was present shot him in the chest. He fell to the floor and was arrested and taken to a hospital for treatment. He recovered and was subsequently charged with robbery.

He was again examined and committed to the Mendocino State Hospital as a victim of dementia praecox. July 8, 1942, he was discharged from that institution as cured. September 1, 1942, his trial occurred. He pleaded not guilty by virtue of temporary insanity. Doctor R. B. Toller, the Superintendent of the Mendocino State Hospital, and Doctor Porter, an attending physician, both testified positively that he was insane at the time of the commission of the robbery. His father testified at length regarding the history of the case as above related. The prosecution offered no other evidence

except the transcript of testimony adduced at the preliminary hearing, and the defendant's statement previously mentioned. The jury was fully and fairly instructed. The sufficiency of the instructions is not challenged. The jury returned a verdict against the defendant finding that he was sane at the time of the robbery. A motion for new trial was denied. The court determined that the crime of which he had been convicted was robbery of the first degree, and committed him to San Quentin. From the order denying a new trial and from the judgment this appeal was perfected.

Regardless of what this court may think of the sufficiency of the evidence to support the verdict and judgment in this case, we are bound by the Chamberlain and O'Brien cases previously referred to and we may therefore not interfere with the determination of the jury and the trial judge regarding the defense of insanity.

The order denying a new trial and the judgment are affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.