[Crim. No. 2759. First Dist., Div. One. Apr. 28, 1952.]

THE PEOPLE, Respondent, v. HAROLD JOHN HARMON, Appellant.

J. W. Lenahan for Appellant.

Edmund G. Brown, Attorney General, and Clarence A. Linn, Assistant Attorney General, for Respondent.

WOOD (Fred B.), J.—Indicted for murder, the defendant was first tried upon his plea of "not guilty" and was found guilty of murder in the first degree, the jury fixing the penalty as confinement in the state prison for life. He was then tried before the same jury upon his plea of "not guilty by reason of insanity" and was found sane at the time the offense was committed. He moved for a new trial, which motion was heard and denied. He then requested a hearing under sections 1368 and 1201 of the Penal Code, which request was heard and denied. Thereupon judgment was rendered.

Defendant has appealed from the judgment and from the orders denying a new trial and a hearing under sections 1368 and 1201 of the Penal Code.

Defendant claims error (1) in instructions given on the issue of not guilty, (2) for asserted insufficiency of the evidence to support the verdict that he was sane when he committed the offense, and for failure of the court to instruct concerning the presumption of innocence, and (3) in the denial of his motion for an inquiry as to his sanity pursuant to the provisions of sections 1368 and 1201 of the Penal Code.

(1) *Concerning the trial on the issue of not guilty,* defendant claims error in respect to two instructions concerning intent and one relating to his confession.

■ These instructions on intent read as follows: "An essential element of the crime of which the defendant is accused is intent, the law requiring that to constitute such a crime there must exist a union or joint operation of criminal

conduct and criminal intent. However, this does not mean that one must know that such conduct is unlawful to be guilty of a public offense such as that charged against the defendant in this case. The intent to do the forbidden thing constitutes the criminal intent. The law requires that to be guilty of crime, one must intend the conduct that fits the description of the crime and must engage in that conduct knowingly and wilfully'' and ''the intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity. For the purposes of the issues now on trial you must presume that the defendant was sane at the time of his alleged conduct which, it is charged, constituted the crime described in the indictment.''

These instructions, defendant says, are correct as concerns general intent but that in this case the theory of the prosecution was that the decedent was killed by the defendant while engaged in the commission of robbery; in such a case, the law requires specific intent to commit robbery, for the killing to amount to murder in the first degree; therefore, these instructions on intent were incomplete and inadequate, prejudicially erroneous.

Defendant invokes the ruling in *People* v. *Sanchez*, 35 Cal. 2d 522 [219 P.2d 9]. In that case instructions similar to those above quoted had been given and the judgment was reversed for the refusal and failure of the court to give an instruction to the effect that intoxication must be taken into consideration in determining the specific intent. In the Sanchez case specific intent was an ingredient of some of the crimes charged (robbery and taking an automobile with intent to deprive the owner of its possession) and the defendant claimed intoxication as a defense, an issue from which the second instruction quoted diverted the attention of the jury in considering the defendant's mental condition.

In the present case, the defense of intoxication was not presented by the defendant as an issue, and the defendant has selected but two instructions, criticising them as incomplete and ignoring many others that were given. The court by its instructions, viewed as a whole, fully and correctly advised the jury. We note, for example, to mention a few, that the court fully and correctly defined the various degrees of manslaughter and murder and the ingredients of each;

the ingredients of robbery including specific intent; the meaning of such terms as ''deliberate'' and ''premeditated''; the presumption of innocence; the requirement of joint operation of act and intent; and, in connection with intent, the mental condition of the defendant when the act was committed, his capacity or incapacity to form the intent, and the factors properly to consider in deciding such questions. The instructions as a whole were accurate and adequate on the point under discussion.

The defendant questions a portion of an instruction which the court gave on the subject of defendant's confession. The court, after (1) observing that evidence had been received tending to show that on an occasion other than this trial the defendant made a statement tending to prove his guilt, (2) defining what a confession is, and (3) advising the jury that, if it should find a voluntary confession was made, the jury was the exclusive judge as to whether or not the confession was true (in deciding which question the jury should consider all the circumstances connected with the making of the statement by the defendant as shown by the evidence), told the jury: ''But even if you should find that a confession was false, either entirely or in part, it remains, nevertheless evidence for your consideration, to be given such significance as your judgment may determine under the instructions that I shortly shall give concerning false statements made by a person accused of crime.''

Defendant claims the quoted portion was prejudicially erroneous because not supplemented by instructions concerning false statements made by a person accused of crime. His point is that the court thereby told the jury, ''in effect, that if they believed defendant lied to the officers when he confessed his guilt, the fact that he had lied tended in some manner and to some degree to prove his guilt. Just how or to what extent was not stated. The jurors were to determine that for themselves, and according to their individual opinions as to what was expected of them in obeying the instruction.'' (*People* v. *Ford,* 89 Cal.App.2d 467, 473 [200 P.2d 867].) The State concedes that this was error but claims it was not prejudicial error. We find that the State's position is correct.

The defendant did not testify at the trial. He had orally confessed to one of the police officers, giving a detailed account of his movements on the day of the killing. That confession was presented to the jury by the testimony of the officer.

But there was ample evidence, quite independent of the confession, to support the verdict.

From defendant's confession it appeared that on December 13, 1950, he went by bus from Sacramento to San Francisco. On arrival he registered at a hotel under an assumed name; made application at a secondhand store to purchase a Luger pistol, giving his correct name and age. The next morning, December 14, he paid for the pistol, picking it up and also some cartridges. Later that day he took a taxicab, drove to a certain hotel and then to Pier 31 where he produced his pistol and told the driver ''I want to get out of San Francisco, and you stay away from the bridges and stay away from the police.'' The driver went south on Bayshore Highway. Near Burlingame, defendant felt that the police would be looking for the cab so he instructed the driver to drive abreast another car. Defendant leaned out the window and with his gun waved the car to the side of the road. The cab and the car stopped, the cab about 50 to 100 feet in front. Defendant and the driver of the cab got out of the cab and while they were engaged in a discussion the driver of the other car escaped down the road at a high rate of speed. Defendant and the driver then reentered the cab and defendant felt that the people in the other car would inform the police so he told the driver to drive fast. Under defendant's orders the driver transferred to another road. Defendant asked the driver for his money and the driver gave him some dollar bills. Defendant felt that he could not let the driver go because he would tell the police. He thought he would have to get rid of the driver. When they got on the open highway, defendant had the cab stopped and told the driver to get out. They both alighted from the cab. (The spot was identified as nine-tenths of a mile from Highway 101 on the Chittenden Pass Road in San Benito County.) Defendant walked the driver away from the cab. He intended to knock the driver out with the gun. As they walked the driver looked as if he were going to take the gun away, so defendant fired the gun and the driver immediately dropped. Defendant went back to the cab. He had trouble starting it. He returned to the driver; turned him from his side to his back; searched him for more money and for matches to read the gas gauge. Defendant then drove toward Los Angeles in the cab. He did not sleep that night, although on one occasion he had tried; he thought the police would be looking for him. He

drove all the way to Ventura, arriving there the next morning, December 15.

Independently of the confession, ample evidence in support of the verdict was adduced. One witness testified that as he was driving south on the Bayshore Highway, between Millbrae and Burlingame, a yellow cab drove alongside of him. Defendant was in the cab and ordered him to pull over, which the witness did, and stopped, thinking defendant had a gun. The cab stopped. Defendant got out, had a Luger pistol in his hand and was apparently giving instructions to the cab driver, talking and directing the driver, who seemed to be objecting. Seeing that the defendant was busy with the cab driver, the witness drove south at a high speed, 105 miles an hour, hoping he would be picked up by the highway patrol, that he might report the incident. He stopped at San Mateo and reported to the local police. Early the next morning, the cab driver was found lying, wounded, on the ground by the side of the highway near Hollister. He was taken to a hospital in Hollister for medical and surgical attention. The attending physician testified that the patient responded slowly to first aid measures. As he became conscious it was found that he was paralyzed from the neck down. An operation was performed to remove bony particles in the area of the spinal cord, which was in the pathway of the object which penetrated the neck. The patient improved for a few hours and then expired. The physician who performed an autopsy described the wound as caused by a foreign object which entered on the right rear side of the neck and passed through, across the vertebral column, leaving on the left side of the neck. Officer Nelder of San Francisco went to Hollister, December 15, to investigate the disappearance of a yellow cab and driver, and then to Ventura where the defendant had been apprehended. On the 16th he took the defendant to the cab driver in the hospital at Hollister. The driver identified defendant as the man who was in the cab, the man with the gun, the person who shot him. Defendant when arrested at Ventura had a Luger gun on his person, the very gun which the salesman of a San Francisco sporting goods firm testified the defendant ordered on December 13 and paid for and took with him on the 14th. Near the cab driver, when found by the highway patrol the morning of the 15th, there were several articles, one an empty cartridge case. A ballistics expert fired several bullets from this gun, compared their markings with those on the cartridge

case found near the cab driver, and determined and testified that the latter was fired from this particular gun, defendant's gun.

This evidence, which supports the verdict independently of the confession, differentiates this case from *People* v. *Ford, supra,* 89 Cal.App.2d 467, in which "there was only slight circumstantial evidence of defendant's guilt aside from the confession." (P. 471.) Our case is like *People* v. *Liss,* 35 Cal.2d 570 [219 P.2d 789] ; *People* v. *Woods,* 35 Cal.2d 504 [218 P.2d 981] ; and *People* v. *Mize,* 100 Cal.App.2d 584 [224 P.2d 452], in each of which the instruction under consideration was deemed erroneous but not prejudicial. In the Liss case there was an abundance of substantial evidence entirely independent of the confession to support the verdict. The independent evidence tended to prove that defendant had an opportunity to commit the theft charged. She had three times given a false name when questioned by the police officers, a fact which indicated consciousness of guilt. Also her failure to testify in her own behalf could have been considered by the jury as tending to indicate the truth of the evidence against her and as indicating that among the inferences which could reasonably be drawn, those unfavorable to her were the more probable. In the Woods case, the independent evidence was clear and convincing testimony to the transaction, supported by circumstantial evidence. In the Mize case, likewise, the independent evidence was abundant and substantial.

In the instant case the independent evidence amply supports the verdict; also, defendant, as in the Liss case, by not testifying, made available to the jury the inferences mentioned in the Liss case. We may add, though not necessary to the decision on this point, that defendant has not suggested that his confession was other than wholly truthful or that Officer Nelder's narration of it was in the slightest degree inaccurate. Indeed, defendant's counsel at the conclusion of defendant's case said that, prior to Officer Nelder's testimony concerning the confession "I had every intention of having defendant testify but Mr. Nelder's account of those things, plus what was brought out by the doctors is so complete that I would not want to change any of it. I think it is true and I do not think I will take the time for repetition, so the defendant will rest."

 (2) *In respect to the trial of the issue of not guilty by reason of insanity,* defendant claims that the evidence is insufficient to sustain the verdict. The record does not sup-

port his contention. Defendant claims that the testimony of five alienists, coupled with the absence of any testimony on this issue offered by the State, overcame and dispelled the presumption of sanity. This point is not well taken.

Three psychiatrists who testified on the trial of the plea of not guilty stated that in their opinion defendant did not have sufficient mental capacity to entertain any specific intent to commit a crime. Two of them testified that in their opinion defendant did not have sufficient capacity to form an independent judgment. At the trial of the plea of not guilty by reason of insanity, two court appointed alienists were the only witnesses. Each of them testified that in his opinion defendant did not understand the nature of his act. One testified that defendant did not have the capacity to differentiate right from wrong. The other testified that defendant would answer ''Yes'' if asked whether he though a crime was wrong, that he would undoubtedly admit he knew he would be punished for a crime and would probably say that he knew what he was doing at the time he committed the crime.

██ Upon the trial of this issue, defendant had the burden of proving his asserted insanity. The State had the benefit of the disputable legal presumption that he was sane, a presumption that remained in to be weighed by the jury with all evidence adduced pro and con. ██ We cannot say *as a matter of law* that the testimony of the alienists overcame this presumption. The jury had before it not only the presumption of sanity but also the conduct and demeanor of the defendant during both trials. In addition, certain portions of defendant's confession tended to indicate a consciousness of guilt and an awareness of the rightness or wrongness of his conduct. Thus, on the highway near Burlingame he attempted to switch cars because he felt the police would be looking for the cab. After failing in his attempt to get another car, he had the cab driver leave the scene at a high rate of speed and switch to another road as he felt the persons in the other car would inform the police. He was afraid to leave the cab driver because he would tell the police. He had the cab driver stop and get out of the car fearing that the cab driver was trying to signal with his lights. He walked the driver off the road and shot him when it looked as if the driver was going to take the gun away from defendant. He drove practically all night without sleep, for attempts to sleep were futile because he was afraid the police were looking for him.

*People* v. *Chamberlain,* 7 Cal.2d 257 [60 P.2d 299] ; *People* v. *Babcock,* 57 Cal.App.2d 54 [134 P.2d 54], and *People* v. *O'Brien,* 122 Cal.App. 147 [9 P.2d 902] furnish ample precedents for our conclusion upon this point.

Defendant speaks of the presumption of innocence and says there should have been an instruction in regard to that presumption. ██ The presumption of innocence is not applicable upon the trial of the issues under the plea of not guilty by reason of insanity. The defendant has already been tried and found guilty. The presumption of innocence has already been overcome, for, as declared by statute, the effect of this presumption of innocence ''is only to place upon the state the burden of proving him [the defendant] guilty beyond a reasonable doubt.'' (Pen. Code, § 1096.) ██ The plea of insanity is one of confession and avoidance. It is predicated upon a finding of guilt beyond a reasonable doubt. (*People* v. *Troche,* 206 Cal. 35, 44 [273 P. 767].) Defendant has the burden of proof. ██ He must show by a preponderance of the evidence that he did not know the nature or the quality of the act committed or that he did not know it was wrong to commit it. He must show that he was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. (*People* v. *Gilberg,* 197 Cal. 306, 313 [240 P. 1000].) We fail to see that the presumption of innocence played a part in the presentation of such a defense.

(3) *Concerning the denial of defendant's motion for an inquiry as to his sanity under sections 1368 and 1201 of the Penal Code,* defendant claims that the trial judge harbored and announced a doubt as to defendant's sanity, wherefore the denial of the motion was prejudicially erroneous.

 ''Section 1368 of the Penal Code provides: 'If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined. . . .' The 'doubt' mentioned is one that must arise in the mind of the trial judge, rather than in the mind of counsel for the defendant or in that of any third person. (*People* v. *Perry,* 14 Cal.2d 387, 399 [94 P.2d 559, 124 A.L.R. 1123], and cases there cited) and the determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the court. Necessarily, an appellate court cannot measure to a nicety the basis for the ruling, and the trial judge

must always be allowed a wide latitude. [Citations.]" (*People* v. *Lindley*, 26 Cal.2d 780, 789 [161 P.2d 227].)

We find nothing in the record of the present case that indicates an abuse of discretion.

Defendant asserts the trial court refused even to entertain the motion, despite a doubt that was in the court's mind evidenced by the court's statement that defendant was perhaps mentally unbalanced. Neither point is well taken. Defendant presented his motion for a new trial and his motion for a hearing under section 1368 at the same time and the record indicates that the court listened and in no way curtailed his presentation of either motion. In denying the motion, the judge discussed various significant factors at some length. He referred to the fact that a jury on two occasions very recently had considered various aspects of the defendant's mental condition. The alienists did not convince him that "the boy, while perhaps mentally unbalanced, was none the less of sufficient mental capacity to know right from wrong. His entire conduct during the day in question and for a day or two preceding, all indicated to me that while possibly there was some mental quirk present in him, he still possessed sufficient mental ability to realize what he was doing and the nature and consequence of his act." The court was not there indicating doubt concerning defendant's sanity. Quite the contrary.

The judgment and the orders appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.