Frederick F. CHASE, Appellant,

v.

STATE of Alaska, Appellee.

No. 100.

Supreme Court of Alaska.

March 27, 1962.

T. N. Gore, Jr., Fairbanks, for appellant.

William Taylor, Dist. Atty., Fairbanks, Ralph E. Moody, Atty. Gen., John E. Havelock, Michael M. Holmes, Asst. Attys. Gen., Juneau, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

Chase admittedly shot his wife to death, climaxing marital difficulties. Within a few minutes he attempted suicide by gunshot but was unsuccessful. At his trial, following an indictment for first degree murder, he relied solely on the defense of insanity. The jury found him guilty of murder in the second degree, and he has appealed.

1. *Test of Criminal Responsibility.*

Our first question is whether the trial court fairly instructed the jury on criminal responsibility as it related to the defense of insanity. The instruction given read in relevant part as follows:

"Insanity, as the word is used in these instructions, means such a diseased and deranged condition of the mental faculties of a person as to render him incapable of knowing the nature and quality of his act and of distinguishing between right and wrong in relation to the act with which he is charged.

"The test of accountability is this: Did the party have sufficient mental capacity to appreciate the character and quality of the act? Did he know

and understand that it was a violation of the rights of another, and in itself wrong? If he had the capacity thus to appreciate the character and to comprehend the probable or possible consequences of his act, he was sane under the law, and is responsible to the law for the act thus committed."

Chase claims it was error to give this instruction; that the jury ought to have been told to find him not guilty by reason of insanity if they believed the killing of his wife was the product of mental disease or mental defect.

The "disease-defect-product" standard for determining criminal responsibility, known as the "Durham rule", was formulated by the Court of Appeals for the District of Columbia in 1954.[1] It represented a departure in that circuit from the previously existing "right-wrong" test based on the M'Naghten rules[2], as modified by the irresistible impulse doctrine.[3]

The Durham opinion has generated considerable debate. It has received favorable comment[4], but has also been criticised.[5] The most recent criticism that has come to our attention is by a judge of the District of Columbia Court of Appeals. In

1. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430. (1954).

2. " * * * to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." M'Naghten's Case, 8 Eng.Rep. 718, 722 (H.L. 1843), quoted in Hall, Responsibility and Law: In Defense of the Mc-Naghten Rules, 42 A.B.A.J. 917 (1956).

3. "One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct, and neither is one who has the capacity to discriminate between right and wrong, but whose mind is in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease and render him incapable of resisting and

controlling an impulse which leads to the commission of a homicide." Commonwealth v. McCann, 325 Mass. 510, 515, 91 N.E.2d 214, 217 (1950). The leading case on this test is Parsons v. State, 81 Ala. 577, 2 So. 854, 866 (1887). This doctrine was adopted by the District of Columbia circuit in 1929. Smith v. United States, 59 App.D.C. 144, 36 F. 2d 548, 550, 70 A.L.R. 654 (1929).

4. Soboloff, Insanity and the Criminal Law: From McNaghten to Durham and Beyond, 41 A.B.A.J. 793 (September 1955); Zilboorg, A Step Toward Enlightened Justice, 22 U.Chi.L.Rev. 331 (1955).

5. Wechsler, The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev. 367; Wertham, Psychoauthoritarianism and the Law, 22 U.Chi.L.Rev. 336 (1955); Hall, Psychiatry and Criminal Responsibility, 65 Yale L.J. 761, 779–780 (1956); Hall, Responsibility and Law: In Defense of the McNaghten Rules, 42 A.B.A.J. 917, 987 (Oct. 1956).

the case of Blocker v. United States,[6] decided March 3, 1961, Judge Burger in a separate opinion made a thorough and penetrating analysis of the whole subject of criminal responsibility. With persuasive reasoning he pointed out the inadequacies and defects of the Durham rule. He recommended that it be abandoned in favor of a rule which would place squarely before the jury the elements of knowledge and capacity to control behavior—that is, whether the act and its consequences were understood and appreciated by the accused, and whether the act was a manifestation of will or choice.[7] Judge Burger also pointed out that every court which had considered Durham had rejected it: three federal courts of appeal, the United States Court of Military Appeals, and the highest courts of twenty states.[8]

We are not persuaded to adopt Durham in this jurisdiction. The "disease-product" test has no real meaning to us, and we venture to say, would have none to jurors who would apply it to the facts nor to the judges who would frame instructions. The terms "mental disease" and "mental defect" are not defined, and hence they would mean in any particular case whatever the experts say they mean. A further difficulty is that the psychiatrists disagree on what is meant by "mental disease", or even if there is any such thing.[9] We shall not impose upon the trial courts and jurors the formidable, if not impossible task of understanding and applying terms whose meaning is unclear to acknowledged experts.[10]

We fully recognize the great difficulty in many cases of ascertaining the mental condition of an accused and of assessing its ef-fect on his conduct at the time of the commission of the criminal act. It is difficult because the criterion of responsibility cannot be defined with complete scientific precision; psychiatric evidence is technical and complex, and diametrically opposed views will frequently be expressed by expert witnesses. Because of these factors we consider it important that the jury, which must make the final decision as to criminal accountability, should be given as far as possible clear and simple principles on which to base their verdict.[11] Such is not accomplished by the Durham rule.

■ We hold that it was not error for the trial court to refuse to give the Durham instruction which Chase had requested. The ultimate question that we must decide is whether the instruction given was erroneous so as to require reversal, entirely apart from a consideration of the Durham test.

The trial judge told the jury substantially that Chase would be criminally responsible for killing his wife if he had sufficient mental capacity to appreciate the character and quality of his act, to comprehend the probable or possible consequences, and to know and understand that what he did was a violation of the rights of another and in itself wrong. If he did not possess such mental capacity, then he was to be acquitted by reason of insanity. This instruction dealt primarily with the faculty of the intellect, the work or function of which is to know, to understand, to see what is. If this faculty were so impaired that Chase did not know or appreciate what he was doing—if he were not then living in the reality of things—then he was not sane

6. 110 U.S.App.D.C. 41, 288 F.2d 853 (1961).

7. Blocker v. United States, 110 U.S.App. D.C. 41, 288 F.2d 853, 858, 867–868, (1961) (separate opinion).

8. Id. 214 F.2d at 866.

9. Judge Burger shows this convincingly in his separate opinion in Blocker, supra note 7, 288 F.2d 853 at 859–860. See also Cavanagh, A Psychiatrist Looks at the Durham Decision, 5 Catholic U.L. Rev. 25, 27–32 (1955).

10. Blocker v. United States, supra note 7, 288 F.2d 853 at 860. See also Hall, Psychiatry and Criminal Responsibility, 65 Yale L.J. 761, 779–780 (1956).

11. See Royal Commission on Capital Punishment 1949–1953 Report (1953), at 285–287 (views of dissenting members), quoted in Weihofen, Mental Disorder as a Criminal Defense 118 (1954).

and accordingly was not to be held accountable for what he did.

On precedent alone we would be justified in finding no reversible error in this instruction; for it is basically the "knowledge" or "right-wrong" test, laid down in M'Naghten's case [12] in 1843 and firmly established by a long line of subsequent cases. It is the primary test of criminal responsibility in the United States, and the exclusive test in a majority of American jurisdictions and in England and Canada.[13] The Supreme Court of the United States has stated that although the science of psychiatry had made tremendous strides since M'Naghten, "the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law." [14] It is true that this statement was made nearly ten years ago, but the highest court has said nothing since then to indicate its viewpoint has changed.

In his instruction to the jury the trial judge referred only to knowledge. He did not deal specifically with man's other faculty, his will, the function and work of which is to choose, to act, to decide. A substantial minority of American courts hold that the test of knowledge alone is not sufficient; that a person who understood that he was committing a wrongful act should nevertheless be excused from responsibility if he was incapable of controlling the impulse to commit it.[15]

Whether this doctrine should be adopted to supplement the "knowledge" or "right-wrong" test of M'Naghten has been the subject of divergent views. Apparently a valid · psychological concept is that man functions as a unitary being, his faculties of reason and will being interdependent and integrated.[16] From this premise Professor Hall has argued that one faculty cannot be severely disordered while at the same time another, fused with the first, may be so little impaired as to remain within the realm of normality.[17] Logically, it would appear to follow from this that if the rational functions, including knowledge of right and wrong, are unaffected, there can be no case where an impulse or urge to commit a wrongful act could be truly "irresistible"; there could not be by reason of insanity lack of power of control.

In answer to this argument, Professor Weihofen, while admitting that the processes of the mind are interrelated, points out that certain forms of mental disorder may affect one process more than the other. "A disorder manifesting itself in impulsions which can be said to have been 'irresistible', may affect intelligence *somewhat*, but not necessarily to such extent as to obliterate knowledge of right and wrong." [18] And a psychiatrist, Doctor Roche, although admitting the "logical validity" of Hall's argument, contends that it is "empirically false".[19] He refers to experience with human behavior where it is found that some persons know what they ought not do, and morally deplore and condemn such acts, yet nevertheless do them just the same. "Such persons", Doctor Roche says, "appear to themselves as well as to others to be impelled by an inner imperative to carry out the forbidden behavior." [20]

12. 8 Eng.Rep. 718, 722 (H.L. 1843).

13. Weihofen, Mental Disorder as a Criminal Defense 51, 68 (1954).

14. Leland v. Oregon, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302, 1310 (1952).

15. Weihofen, Mental Disorder as a Criminal Defense 51–52, 81 (1954).

16. Roche, The Criminal Mind 186–187 (1958).

17. Hall, Psychiatry and Criminal Responsibility, 65 Yale L.J. 761, 775 (1956); Hall, Responsibility and Law: In Defense of the McNaghten Rules, 42 A.B. A.J. 917, 985 (Oct. 1956) ; Hall, Mental Disease and Criminal Responsibility—M'Naghten Versus Durham and the American Law Institute's Tentative Draft, 33 Ind.L.J. 212, 213–214, 222–223 (1958).

18. Weihofen, Mental Disorder as a Criminal Defense 96 (1954).

19. Roche, The Criminal Mind 187 (1958).

20. Id. at 187–188.

Another psychiatrist, Doctor Cavanagh, discusses at some length the subject of the will and irresistible impulse.[21] Preferring the terminology "unresisted urge" to "irresistible impulse", he defines an unresisted urge as "one which, because of mental illness, so far causes the individual to lose his power of choice in regard to particular acts that in spite of the fact that he may recognize an act as wrong, he feels so impelled to act that he is unable to adhere to what he considers right."[22] In considering this concept in reference to the psychopath he says:

"The psychopath *knows* the difference between right and wrong, his subjective judgment is correct but he has no *feeling* for right and wrong. He is amoral, he has no ethical sense. If we accept then the concept of irresistible impulse as the ability to distinguish right and wrong but inability to adhere to the right then we have a perfect description of the psychopathic personality. Therefore a clear defense for every psychopath would be the irresistible impulse".[23]

Dr. Davidson, author of a book entitled Forensic Psychiatry (1952), points out the disadvantages of an expanding concept of the doctrine of irresistible impulse. In the chapter dealing with Criminal Responsibility (p. 12) he says:

"Where irresistible impulse is a defense, it is usually broad enough to include both psychotic and psychoneurotic compulsions, though in some jurisdictions only psychotic impulses are grounds for acquittal. The danger is that the concept, once accepted, might be broadened to include the kind of impulse which occurs to normal people from time to time in response to rage or frustration. To be sure, it seems unfair to hold a person accountable for doing that which he could not refrain from doing. But there are good reasons for this procedure. When the doctrine is accepted with reference to psychotic impulses, it is logical for defense counsel to insist that it apply with equal force to neurotic compulsions, for these too are the result of psychiatric disorder. Then comes the plea that it should cover impulsive acts committed during drunkenness, for intoxication is also a form of mental illness. One step further carries us to the point where it furnishes a shield to anyone who commits a crime in a fit of rage, pique, or frustration."

■ The above discussion points out the lack of agreement among learned men as to whether it is essential to a fair instruction on criminal responsibility that the jury consider not only if the accused was rational when he did the act, but in addition, if he also had the capacity to control his behavior. We do not adopt the second element as an additional test of criminal accountability. The difficulties encountered in attempting to differentiate between abnormal and normal are great. But the present state of development of the science of psychiatry does not provide a basis of knowledge which persuades us that it is necessary or even advisable to apply this theory.

■■ The important thing to remember is that we are concerned here with the law of insanity and legal responsibility, and the grave obligation placed on the law to protect society. As a matter of policy we believe the law is intended to exculpate from accountability for actions only those who suffer from a major mental disorder or disease—those who, because of some mental derangement, are lacking in reason or understanding or realization. Considering existing knowledge of human behavior in the light of present psychological and philosophical studies which are compatible with sound legal principles, we hold that a test of legal insanity framed in terms of capacity

---

21. Cavanagh, A Psychiatrist Looks at the Durham Decision, 5 Catholic U.L.Rev. 25, 45–48 (1955).

22. Id. at 48–49.

23. Id. at 48.

to understand or realize the nature and quality and consequences of conduct, and whether such conduct is wrong, is the proper test of criminal responsibility for this jurisdiction.

We believe that it will work satisfactorily in practice, particularly where the expert witnesses are given wide latitude in describing their findings in their own terms; where the jury is given, so far as relevant and the rules of evidence will allow, the picture of the whole man. That was done here. An experienced psychiatrist, as a witness for Chase, testified at length—without any limitation by the court or objection from the state. Under the instruction given, had the jury accepted the witness's testimony they undoubtedly would have found Chase not guilty by reason of insanity.[24] But they apparently chose to believe other evidence offered by the state which tended to prove that Chase was not insane when he killed his wife. That was the jury's function and its right. We find no error in the trial court's instruction on criminal responsibility.

Although not made a point on appeal, our attention is drawn to the conjunctive wording used by the trial court in that part of its instruction defining "insanity." That term was defined as such a deranged condition of the mental faculties of a person as to render him incapable of "knowing the nature and quality of his act *and* of distinguishing between right and wrong in relation to the act with which he is charged". In wording this was not identical with M'Naghten. There the test was whether a person was laboring under such a defect of reason, from disease of the mind "as not to know the nature and quality of his act; *or*, if he did know it, that he did not know he was doing what was wrong."[25]

Some courts have noted a distinction between the conjunctive and disjunctive wording. In People v. Sherwood[26], the New York court of appeals expressed doubt that the jury had a clear conception of when the defendant would be criminally liable, since the trial court's instruction had not made it clear that a lack of knowledge (from defect of reason), *either* of the nature and quality of the act *or* that the act was wrong, would be sufficient to excuse him from liability. In 1899 the Supreme Court of Nebraska found an instruction erroneous where the conjunctive wording had been used.[27] The court's reasoning was that the defendant may have understood the nature of his act (that if he applied a match to a building it would be destroyed by fire), but may not have had the ability to distinguish between right and wrong with respect to such act.

Other courts that have considered the question have held there is no distinction between ability to know of the nature and quality of an act and the ability to know whether the act was wrong. For example, in Jessner v. State, the Supreme Court of Wisconsin held that the two phrases—

" * * * express exactly the same thing, but in different language. They are synonymous, and their conjunctive use results only in emphasis. If a person is unable to distinguish between right and wrong in respect to an act, he must be unaware of the nature and quality of the act which he is doing * * *."[28]

24. The psychiatrist testified that at the time Chase shot his wife he was suffering from a "severe agitated depression"; that he was functioning in an entirely unconscious state and not possessed of any purposeful control or restraint over his actions and behavior; that he had no awareness of why he shot her; and that the act of firing the shots was the result or consequence of his disturbed mental state.

25. M'Naghten's case, supra note 2.

26. 271 N.Y. 427, 3 N.E.2d 581, 583 (1936).

27. Knights v. State, 58 Neb. 225, 78 N.W. 508, 509 (1899).

28. 202 Wis. 184, 231 N.W. 634, 639, 71 A.L.R. 1005 (1930). See also Montgomery v. State, 68 Tex.Cr.R. 78, 151 S.W. 813, 817 (1912) where the court said "It is almost inconceivable that a

■ To hold it reversible error to use the two phrases conjunctively would, in our opinion, infer that the intellect must be divided into two distinct parts. One part would be rational, so that the nature and quality of the act would be understood; and the other part would be irrational, so there could be no understanding that the act was one generally condemned by the community and therefore wrongful. The apparent implication here would be that one mind could be simultaneously normal and abnormal, sane and insane. That this could be is not supported by established medical or psychiatric principles that have come to our attention, nor by our own study and experience and knowledge in the field of human behavior. We should not, therefore, require the trial court to infer to a jury that such a condition of the mind does exist—which we would be doing if we insisted that the disjunctive, rather than the conjunctive wording of the test must be used. We find no error in that part of the court's instruction defining insanity.

2. *Burden of Proof.*

Chase argues that the state failed to sustain its burden of proof concerning his sanity. This presupposes that the state had the burden of proving him sane. That is the question to be decided.

■ Since men are normally responsible for what they do, all courts agree that the prosecution may start with the presumption that the defendant was sane and responsible when he committed the act.[29] But the courts are divided as to what happens after evidence of insanity has been introduced. Some hold that the prosecution must then prove the sanity of the defendant; others, that the defendant still has the burden of proving insanity.[30]

■ The basis for the rule placing the burden on the state is that since a person of unsound mind is not criminally responsible, the state must prove sanity beyond a reasonable doubt just as it must prove any other essential fact in the case.[31] The objection to that rule, as we see it, is that sanity is not an ingredient of the crime, but rather a quality of the one who commits it. The state was required to prove in this case that Chase killed his wife, and that he did this purposely and maliciously. These are the elements that constitute the crime of second degree murder. Sanity is not one of these. It is true that purpose and malice cannot exist without sanity. But sanity is presumed; it is a pre-existing fact rationally inferred from general experience with human nature which teaches us that in the vast majority of cases man is a rational being.[32] We hold this general proposition creates such a strong probability or inference that a specific defendant is sane, that if he asserts the contrary he should be required to establish his insanity by a preponderance of the evidence.[33]

man could be sane enough to fully appreciate and know the nature and quality of an act, and yet not know whether it was right or wrong to commit such an act."; and Maas v. Territory, 10 Okl. 714, 63 P. 960, 961, 53 L.R.A. 814 (1901), where it was said that "knowledge of the wrongfulness of an act also embraces capacity to understand the nature and consequences of the same." A discussion of this question is found in Weihofen, Mental Disorder as a Criminal Defense 73–76 (1954).

29. See cases cited in Weihofen, Mental Disorder as a Criminal Defense 214 (1954).

30. For a complete discussion of conflicting views, with citation of authorities, see Weihofen, supra note 29, at 212–272.

31. Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, 754 (1897).

32. State v. Quigley, 26 R.I. 263, 58 A. 905, 908, 67 L.R.A. 322 (1904); State v. Lewis, 20 Nev. 333, 22 P. 241, 249–250 (1889).

33. State v. Quigley, supra note 28, 58 A. at 907–910, 67 L.R.A. 322; State v. Clark, 34 Wash. 485, 76 P. 98, 101–102 (1904); State v. Colley, 78 Ohio App. 425, 65 N. E.2d 159, 160 (1946); Commonwealth v. Carluccetti, 369 Pa. 190, 85 A.2d 391, 395 (1952); People v. Harmon, 110 Cal. App.2d 545, 243 P.2d 15, 19–20 (1952); 9 Wigmore, Evidence § 2501, at 361 (3d ed. 1940).

### 3. *Other Alleged Errors.*

Chase assigns as error the admission of rebuttal testimony by the state which went solely to the issue of insanity. He had previously put on an expert witness, three lay witnesses, and testified himself on this issue. The state relied solely on non-expert testimony by two witnesses. One of them, Mrs. Hill, testified she had known Chase since 1956 and that she had never seen him in a highly depressed state; that he was a visitor in her home the evening before the killing and at that time acted just the same as always. Over Chase's objections, she was also allowed to testify as to conversations had between her and Mrs. Chase, which concerned the latter's fear of her husband and threats made by him to kill her. According to Mrs. Hill, about two weeks before the killing Mrs. Chase related certain statements made to her by her husband, such as, that he was going to kill her and plead temporary insanity, and that "anybody with any sense can fool a psychiatrist." Chase argues that this sort of testimony was inadmissible as hearsay and was so prejudicial as to require reversal.

Mrs. Chase's statements as to what her husband told her could be received without reference to the truth of what was said, because the fact that he killed his wife was not in issue. The statements were relevant only to show Chase's state of mind at that time; there was a possibility they would create an inference in the minds of the jury that he knew what he was about and was not insane. Where a person's mental state is the fact in issue, as it was here, then it is not a violation of the hearsay rule to admit statements purportedly made by such person which tend to indicate what his mental state was.[34]

Mrs. Hill's testimony may have been "prejudicial" in the sense that it was damaging to Chase's defense of insanity. But it does not follow that error was committed in allowing that testimony to be heard and considered by the jury. Great latitude is allowed in the admission of evidence relevant to the issue of insanity, particularly where the alleged insanity is of a temporary nature.[35] Evidence on this issue is largely within the discretion of the trial judge[36], and we shall not reverse his ruling unless it is clearly erroneous. We do not find such error here.

Chase also assigns as error a supplemental instruction given after the jury retired, but upon their request. The jury, after some deliberation, returned into court and informed the judge that they presently stood eleven to one, and had been unable to break the deadlock because one juror did not interpret the law and the evidence the same as the majority. The jury asked the judge whether this deadlock proved that the state had not proved its charge beyond a reasonable doubt and if the jury should now "step down" to a lesser charge even if the majority felt that this should not be done.

Following this communication to the court, the judge gave the controversial additional instruction. In substance the court told the jury that although each juror's verdict should be the result of his own convictions and not a mere acquiescence in the conclusions of the other jurors, yet each juror should examine the questions submitted with candor and with a proper regard and deference to the opinions of each other. The judge told the jury that where a large number of the panel were for conviction or acquittal, a dissenting juror should consider whether a doubt in his mind is a reasonable one which makes no impression upon the

---

34. 2 Wigmore, Evidence § 228, at 14; 6 Wigmore, Evidence §§ 1789–1790 (3d ed. 1940); Johnson v. Nicholson, 159 Cal. App.2d 395, 324 P.2d 307, 316 (1958); Marks v. State, 216 Miss. 342, 62 So.2d 392, 394 (1953); Jones v. State, 156 Tex.Cr.R. 475, 243 S.W.2d 848, 850

(1951); McCormick, Evidence § 228, at 467–468 (1954).

35. George v. State, 240 Ala. 632, 200 So. 602, 606 (1941); State v. Warren, 317 Mo. 843, 297 S.W. 397, 402 (1927).

36. Hart v. United States, 130 F.2d 456, 457 (D.C.Cir. 1942).

minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence with the same attention. However, the court emphasized the fact that no juror should surrender his conscientious convictions, and that a verdict arrived at and to which a juror agrees must be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of the other jurors. The judge then directed the jury to again retire to consider their verdict, which they did.

 The supplemental instruction as given verbatim was previously considered by the Ninth Circuit and held to be a correct statement of the law.[37] We agree, and therefore find no error.

Considering the record in this case as a whole, we believe Chase had a fair trial. The judgment is affirmed.

AREND, Justice (dissenting, in part).

I agree with the opinion of the majority that the experts in medicine and psychiatry have not yet reached such unanimity in their thinking on what is the proper test for determining criminal responsibility in its relationship to the defense of insanity as would warrant us to forsake the standard set forth in the McNaghten Rules for that known as the "Durham Rule." For the same reason, I am presently opposed to modifying the "knowledge" test of McNaghten by the addition of the so-called "irresistible impulse" test, or to changing over to the American Law Institute Rule which was very ably presented for our consideration in an appendix to the state's brief.

I also agree with the majority that a defendant seeking to defend against conviction for a criminal act because of insanity should be required to prove insanity by a preponderance of the evidence; but I dissent from that part of the majority opinion which holds that it was not error for the trial court in its instruction to the jury [1] on criminal responsibility to use the conjunctive rather than the disjunctive in the wording of the test under the McNaghten Rules.

That instruction, as I read it, required the defendant Chase, in order to be acquitted of the charge against him, to prove that he was suffering from such a diseased and deranged condition of his mental faculties as to render him not only incapable of knowing the nature and quality of his act but also incapable of distinquishing right and wrong in relation to the act. This placed upon him a double burden not comtemplated or required under the wording of the McNaghten Rules.

To repeat, the instruction in question states that both incapacity to know the nature and quality of his act and incapacity to distinguish right and wrong would have to be proved by the defendant to entitle him to an acquittal. Under McNaghten, proof of only one of these incapacities was sufficient.[2]

The judgment of conviction should be reversed and the case remanded for a new trial because of the erroneous instruction given.

37. Hutson v. United States, 238 F.2d 167, 173, 16 Alaska 485, 497–499 (9th Cir. 1956); Christy v. United States, 261 F. 2d 357, 361, 17 Alaska 107, 116 (9th Cir. 1958), cert. denied 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535 (1959).

1. The pertinent part of the instruction to which I object is fully set forth near the beginning of the majority opinion and so need not be repeated here.

2. See Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, 754 (1897); Andersen v. United States, 237 F.2d 118, 127 (9th Cir. 1956); Travis v. State, 160 Ark. 215, 254 S.W. 464 (1923); State v. Moore, 42 N.M. 135, 76 P.2d 19, 32–33 (1938); Smith v. State, 12 Okl.Cr. 307, 155 P. 699 (1916); State v. Brumfield, 104 Or. 506, 209 P. 120, 129–130 (1922); State v. Green, 78 Utah 580, 6 P.2d 177, 184 (1931). In all of the foregoing cases an instruction using the disjunctive wording was approved.